J-S08029-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| IN THE MATTER OF THE ADOPTION OF L.N.W.-J. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| APPEAL OF: A.W., NATURAL MOTHER | : : : : : : : : : | No. 1521 WDA 2019 |

Appeal from the Decree September 9, 2019
In the Court of Common Pleas of Erie County Orphans' Court at
No(s): 61 IN ADOPTION 2019

BEFORE: OLSON, J., McCAFFERY, J., and MUSMANNO, J.

MEMORANDUM BY McCAFFERY, J.:                                    FILED MARCH 09, 2020

Appellant, A.W. (Mother), appeals from the decree entered in the Erie County Orphans' Court granting the petition of the Erie County Office of Children and Youth (the Agency) to terminate involuntarily Mother's parental rights to her minor child, L.N.W.-J. (Child), pursuant to Subsections 2511(a)(1), (2), (5), and (b) of the Adoption Act.[1]  After review, we affirm.

Both Mother and Father have been described as having intellectual disabilities, and Mother as unable to read.  N.T. Termination H'rg, 9/4/19, at 26-27, 32.  We summarize the Orphans' Court thorough recitation of the

_____

[1] 23 Pa.C.S. §§ 2101-2938.  By separate decree the same day, the Orphans' Court involuntarily terminated the parental rights of Child's father, W.D.S. (Father).  According to the Orphans' Court, Father has not appealed from that decree.  Orphans' Ct. Op., 11/8/19, at 1 n.1.

factual and procedural history of this matter. See generally Orphans' Ct. Op. at 1-7. Child was born on November 11, 2018. Two days thereafter, he was removed from Mother's care by an emergency protective order and placed in the care and custody of the Agency. On November 16th, the Agency filed a petition to adjudicate Child dependent, alleging Mother "presented cognitive limitations which affected her ability to safely parent Child, and [she] was unable to demonstrate the skills necessary to care for" Child's basic needs.[2] Id. at 1-2.

The Orphans' Court conducted an adjudication hearing on November 27, 2018. Mother stipulated to the allegations set forth in the Agency's dependency petition. Orphans' Ct. Op. at 2. The court ordered the following permanency plan for Mother:

1. Participate in a cognitive evaluation and . . . follow all recommendations;

2. Participate in an evaluation to determine if she is eligible for an ID [(Intellectual Disability)] supports coordinator[, who would "help Mother navigate things and work with her];

3. Participate in the Project First Step [parenting] program and follow all recommendations; and

4. Exhibit the ability to care for [Child's] needs . . . by attending all medical and other necessary appointments.

Id.

_____

[2] According to the Agency, it was also concerned with "aggressive, abusive behavior" between Mother and Father, and Mother had an active Protection from Abuse order against Father. Agency's Brief at 3.

On January 22 and 31, 2019, psychologist Robert Iddings, Ph.D., performed a cognitive assessment and psychological evaluation of Mother. We note that at this time, Mother was living at the home of her sister, A.J. (Aunt), along with Mother's father (Grandfather). Aunt accompanied Mother to the cognitive evaluation. The Orphans' Court summarized:

> Aunt told Dr. Iddings that Mother would need constant support if she was caring for Child. It was reported that Mother had deficits in self-care and independent living skills. Communication with Mother was difficult as she spoke slowly and had a speech impediment. Mother had received life skills and learning support throughout her educational career.
>
> Dr. Iddings . . . conducted a review of records; a diagnostic clinical interview; testing observations; and a number of testing instruments.[3] . . .

Orphans' Ct. Op. at 4.[4] Dr. Iddings opined the test results indicated, inter alia: Mother's "estimated cognitive functioning was extremely low;" her verbal

_____

[3] The Orphans' Court summarized that the tests performed by Dr. Iddings were: (1) the Bender Visual Motor Gestalt Test- Second Edition, which assesses "working and short term memory;" (2) the Wechsler Abbreviated Scale of Intelligence-Second Edition test, which "measures overall cognitive functioning;" (3) Corner's Continuous Performance Test-Third Edition, which "measures attention related problems;" and (4) the Adaptive Behavior Assessment System-Third Edition test, which "measures 10 areas critical for successful everyday functioning, such as the need for communication, social and academic skills, functioning effectively in the community, engaging in leisure and work, [and] caring for individual health and safety needs." Orphans' Ct. Op. at 4-5.

[4] For ease of discussion, we have modified the Orphans' Court references to "the child," "the mother," "Maternal Aunt," and other individuals to comport with our appellations of "Child," Mother," "Aunt," etc.

comprehension ("ability to assess and apply verbal knowledge") was likewise "extremely low;" she had "an intellectual disability in the mild range;" and there was a "high likelihood" Mother had "a disorder characterized by attention deficits." Id.at 4-5. Dr. Iddings further opined:

> Based on the interviews and test results, cognitively Mother is functioning in the extremely low range. She appears to have significant deficits in short-term and working memory capabilities. In addition, it appears she has deficits in visual, auditory, and visual/motor information processing. Individuals with similar levels of cognitive functioning can sometimes care for themselves with minimal support. Mother would need significant support and assistance in meeting social, emotional, academic, and daily needs of a child. She could be in an assistive role if extended family members were the primary role as caregivers. . . .

> Socially, Mother has borderline adaptive skills compared to others her age[, 23.[5]] She does demonstrate substantial difficulties in navigating the community independently, academics, care for her health and safety, and initiating and completing tasks independently.

> . . . Her current level of functioning reportedly impairs her ability to work and live alone without support from her sister and father. . . . Primary concerns regarding Mother include deficits in independent living skills, communication/speech delays and intellectual functioning. . . .

Id.

The Orphans' Court conducted a permanency review hearing on February 6, 2019, at which it considered Dr. Iddings' report. See Orphans' Ct. Op. at 2-3. Kenneth Parmerter, the Agency's caseworker supervisor,

---

[5] See Agency's Petition for Involuntary Termination of Parental Rights, 6/21/19, at 1.

indicated Mother "had only been going through the motions with Project First [S]tep, and was not fully grasping what was being asked of her, and what was needed to care for a baby fulltime." Id. at 2.

> The Agency recommended adding a goal of adoption concurrent with reunification[.] The Court however, with Mother's agreement, rejected [the Agency's] recommendation and ordered permanent legal custodianship with Mother's sister, [Aunt. The Agency] was not to offer any further services to Mother, and the Court made it very clear that Mother was not to be left alone with Child in a child-caring capacity.

Id. at 3.

Less than two months later, however, on April 2, 2019, Child was removed from Aunt's care and placed in a foster home. The Orphans' Court explained:

> Aunt, despite the Court's admonition, had left Mother alone with Child on a number of occasions in a child-caring position. There were concerns about Aunt using . . . marijuana in the home[, which were confirmed by a positive urinalysis test.] Aunt got into a fight outside a bar [but] felt that since the fight was outside the home[,] there was no issue. Numerous social media posts indicated Child being alone with Mother and the child's father, and Aunt partying. Aunt took a 3rd shift job and could not account for who was taking care of Child while she was at work.
>
> Child suffered from a number of health problems. Child was diagnosed with plagiocephaly (misshapen head) and torticollis (stiff neck). He was taken to Shriners' Hospital, where the staff recommended a corrective helmet. Mother and Aunt wanted to wait and see if the problem corrected itself. The problem persisted, and at a second appointment, staff once again recommended a corrective helmet. This time, Mother and Aunt refused[,] saying that the helmet made Child "look silly".

Orphans' Ct. Op. at 3 (paragraph break added).

The Orphans' Court conducted a second permanency review hearing on

June 5, 2019. The Agency requested a goal change to adoption, N.T. at 14, which the Court granted on June 10th. See Amended Permanency Review Order, 6/17/19; Permanency Review Order, 6/10/19.

On June 21, 2019, the Agency filed a petition to terminate involuntary both Mother's and Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (b). The Orphans' Court conducted a hearing on September 4, 2019; at that time, Child was nine months old. Mother and Father were present and each represented by counsel. Child was represented by a guardian ad litem, who argued in favor of termination.[6] N.T. at 47-49. The Agency presented Dr. Iddings' report, as well as the following testimony.

Agency Caseworker Supervisor Parmerter testified neither parent had demonstrated a consistent ability to provide for Child's care and needs, and that termination was in Child's best interest and would have no detrimental effect on Child. N.T. at 15. Agency Permanency Caseworker Jason Billings testified Child was currently "placed in a potential adoptive [foster] home." Id. at 24. The Orphans' Court summarized his testimony as follows:

> Mr. Billings visits Child in the [foster] home and makes sure his needs are being met. [Child was initially placed with these foster parents,] then returned to them after Child was removed from Aunt's care. Mr. Billings indicated the foster parents do a good job meeting Child's needs[,] including medical [sic]. They place the corrective helmet on him to correct the shape of his head, and are getting Early Intervention services to meet his other needs[.] Child is comfortable with them, and there is a bond between Child

_____

[6] The guardian ad litem, Christine Fuhrman Konzel, Esquire, has submitted a brief to this Court in support of termination.

and [the foster] parents. Mr. Billings was of the opinion that termination of Mother's parental rights would be in [Child]'s best interests, and that termination would not detrimentally impact Child.

Orphans' Ct. Op. at 6.

Finally, Jolene Ottaviani, a family specialist for Project First Step, testified as follows:

[Ms. Ottaviani] began working with Mother prior to Child's birth on basic need areas such as feeding, getting up, and changing diapers. A teaching tool called a RealCare simulator doll was implemented. [The doll was linked to a wristband worn by Mother and would indicate if the doll were left in a car seat or in the cold, whether Mother picked up, fed, or burped the doll or changed its diaper, and "even . . . if it was rough handled."[7]] Mother had the doll for a weekend. Mother was able to score well for first time use, but before she could use the doll a second time, she gave birth. At that point, Ms. Ottaviani worked directly with Mother, using parenting techniques and materials tailored to Mother's learning abilities. Tasks would have to be worked on longer with Mother due to her slower learning, but she could do feeding, burping, [and] changing. However, Ms. Ottaviani concluded that Mother could not meet the basic needs of her child independently by herself. One area of concern was that without Mother being able to read, and her intellectual limitations, she wouldn't be able to understand a doctor, or enroll Child in school by herself.

Orphans' Ct. Op. at 6 (emphasis added). We further note Ms. Ottaviani testified she observed Mother's interaction with Child on "a lot" of "[Agency] visits," when they conducted parenting training. N.T. at 36-37. Ms. Ottaviani stated Mother enjoyed spending time with Child and "was formulating a bond with" him. Id. at 33, 36.

_____

[7] N.T. at 27-28.

Child's guardian ad litem addressed the Orphans' Court as follows:

[T]his is . . . a difficult case, in my opinion. [B]oth parents have intellectual [dis]abilities. Clearly [Mother] really loves her child. . . .

However, even with [Mother's] limited ability, it's my position, as the advocate for the best interest of [C]hild, that [involuntary termination] is probably appropriate in light of the fact that[,] where [Mother] was living and within the family unit, they still [were] not able to abide by the court order that she be supervised. And it's clear, from all the witnesses['] testimony, that supervision is warranted here.

\* \* \*

. . . I wish the family would have stepped up in a different way, but they just didn't. So, I believe that, in light of all this, that it's probably best that termination be granted against [Mother]. . . .

Orphans' Ct. Op. at 7, quoting N.T. at 47-49.

Mother did not testify or present evidence. Father testified on his own behalf against termination of his parental rights. See N.T. at 41-44.

By decree dated September 6, 2019, and entered September 9, 2019,[8] the Orphan's Court involuntarily terminated the parental rights of Mother pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (b). On October 4, 2019, Mother filed a timely notice of appeal, as well as a concise statement of errors

_____

[8] We note that although the decree was dated September 6, 2019, Pa.R.C.P. 236(b) notice was not provided until September 9th. See Pa.R.A.P. 108(b) ("The date of entry of an order in a matter subject to the Pennsylvania Rules of Civil Procedure shall be the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.Civ.P. 236(b).").

- 8 -

complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).

On appeal, Mother raises the following issues for our review:

A. Whether the Orphans' Court committed an abuse of discretion and/or error of law when it concluded that the Agency . . . established, by clear and convincing evidence grounds for termination of parental rights under 23 Pa.C.S.[ ] § 2511(a)(1), (2), and (5)?

B. Whether the Orphans' Court committed an abuse of discretion and/or error of law when it concluded that the termination of [Mother's] parental rights was . . . in [Child]'s best interests under 23 Pa.C.S.[ ] §2511(b)?

Mother's Brief at 3.

First, Mother avers the Orphans' Court erred in concluding the Agency established clear and convincing evidence for termination under Subsections 2511(a)(1), (2), and (5).[9] She argues she has remedied the conditions that caused Child's removal from her care, and there is no continued incapacity, abuse, neglect or refusal. In support, Mother maintains: Caseworker Supervisor Parmerter testified she "engaged in all available service[s] for education and support in raising [C]hild;" and Project First Step family specialist Ms. Ottaviani testified Mother "could do" feeding, burping, and changing. Mother's Brief at 8. Mother states she has attended all of her service provider appointments and the hearings. Finally, Mother asserts her

---

[9] Throughout her argument, Mother makes brief references to Subsection 2511(a)(8). Mother's Brief at 6, 7, 10. However, it is clear the Agency did not seek, and the Orphans' Court did not grant, termination pursuant to this subsection.

"family support system" could "assist with childcare when needed," and that Ms. Ottoviani had indicated Grandfather "was acceptable for providing the needed supervision if necessary." Id. at 8-9. After careful review, we conclude no relief is due.

We note the relevant standard of review:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. . . . We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

In re B.L.W., 843 A.2d 380, 383 (Pa. Super. 2004) (en banc) (citations omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis of: first, whether the party seeking termination proved by clear and convincing evidence the grounds for termination delineated in Subsection 2511(a); followed by the best interest, needs, and welfare of the child under Subsection 2511(b). 23 Pa.C.S. § 2511(a)-(b); In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007). "Clear and convincing evidence" is evidence "that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" In re M.G., 855 A.2d 68, 74 (Pa. Super. 2004) (citation omitted).

Section 2511 states, in pertinent part:

(a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . . .

23 Pa.C.S. § 2511(a)(2), (b).

In order to terminate parental rights pursuant to 23 Pa.C.S.[ ] § 2511(a)(2), the following three elements must be met (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

In re Adoption of M.E.P., 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include [the] incapacity to perform parental duties." In re Adoption of C.D.R., 111 A.3d 1212, 1216 (Pa. Super. 2015) (citation

omitted).

The Orphans' Court addressed Mother's arguments as follows:

The basis for the dependency adjudication of Child was Mother's inability to properly parent him due to her cognitive deficits, which led to her to failure to be able to meet Child's basic needs. Mother participated in Project First Step, and with supervision, could perform such tasks as feeding and burping the baby. Services were offered to Mother to help train her in basic child care. [Ms.] Ottaviani . . . tailored a parenting program to Mother's intellectual level. Mother was able to learn how to feed, change and burp a baby. However, this was done with supervision. Ms. Ottaviani concluded Mother could not meet her child's basic needs independently. Mother's lack of communication skills and limited intellectual functioning would not permit her to understand a doctor's advice if Mother had to be on her own with [C]hild, according to Ms. Ottaviani.

Ms. Ottaviani's observations corroborated [Dr. Iddings' report.] Mother had deficits in independent living skills, communication and intellectual functioning. . . . Mother demonstrated substantial difficulties caring for her own needs for health and safety, let alone a child's needs. . . . Also, Mother's failure to accept medical advice in regards to the necessity of a corrective helmet for Child on the basis it makes him "look funny" speaks volumes about Mother's inability to grasp necessary factors affecting Child's health and safety.

Dr. Iddings indicated Mother could be in an assistive role with her child if family members were the primary role as caregivers. That option was tried by the Court in February, 2019 when Aunt was appointed legal custodian with Mother's consent. This resolution only lasted 2 months until April, 2019. Child had to be removed after numerous incidents of [Aunt leaving Mother] alone to provide childcare despite the Court's strong admonition against that possibility. . . . Strong odors of marijuana were noticed on home visits by service providers, which led to a positive urinalysis by Aunt. The [guardian ad litem] summed up the family's failure best in stating[, "T]hey were not able to abide by the court order that . . . Mother be supervised. . . [.] I wish the family would have stepped up in a different way, but they didn't."

Mother complains that the Court did not adequately consider

Grandfather as a resource for supervision and child care with Mother. [However, Grandfather] was just as negligent in leaving Mother alone on numerous occasions to provide child care as Aunt. . . . Grandfather was a resident of the home where drugs were being used in the presence of [Child]. His lack of understanding of the critical necessity of supervising his daughter's care of her child is glaring. Further, this issue more appropriately belongs in front of the dependency court as far as the placement of Child. The family has demonstrated their inability to act as primary caretakers of Child, and their parental rights are not at issue in this matter. However, suffice it to say Grandfather would not be a resource to provide supervision and child care.

Mother did not make any progress in remedying the conditions which led to her baby's placement. Mother's lack of learning capacity certainly contributed to her failure, but the evidence provides that nothing will change to remedy Mother's inability to provide basic child care at any time in the foreseeable future.

Orphans' Ct. Op. at 10-12.

Our review of the record supports the Orphans Court's finding of grounds for termination under Subsection 2511(a)(2) — that Mother's continued incapacity, in the form of cognitive limitation, has caused Child to be without essential parental control or subsistence necessary for his physical and mental well-being. See 23 Pa.C.S. § 2511(a)(2); In re Adoption of C.D.R., 111 A.3d at 1216; In re Adoption of M.E.P., 825 A.2d at 1272. We especially note Dr. Iddings' report finding Mother had "extremely low" cognitive function; Ms. Ottaviani's testimony that although Mother performed well with the RealCare simulator doll and could feed, burp, and change Child, Mother "could not meet the basic needs of her child independently by herself;" and Aunt's own statement to Dr. Iddings that Mother "would need constant

support if she was caring for her child." See Orphans' Ct. Op. at 4-6. We also reiterate the Orphans' Court effort, at the February 6, 2019 permanency review hearing, to keep Mother and Child together in a safe environment, by granting legal custody to Aunt and directing Mother "was not to be left alone with the baby in a child-caring capacity." See id. at 3. However, the Court found this arrangement was unsuitable, in light of Aunt's conduct and Grandfather's allowing Mother to be left alone to care for Child. We agree with the Court that, pursuant to Subsection 2511(a)(2), the Agency presented clear and convincing evidence Mother was unable to remedy the conditions which led to Child's placement, namely her incapacity in the form of cognitive limitation. See In re B.L.W., 843 A.2d at 383. In light of this disposition, we need not review the Court's determinations under Subsections (a)(1), (5) or (8). See id. at 384.

In her second issue, Mother alleges the Orphans' Court erred in concluding termination was in Child's best interests pursuant to Subsection 2511(b). Mother's sole support is citation to Ms. Ottaviani's testimony that Mother "enjoyed spending time with [C]hild" and "was formulating a bond with [C]hild." Mother's Brief at 11.

This Court has stated:

[I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." [T]he determination of the

child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (citations omitted). "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case."

In re K.Z.S., 946 A.2d 753, 762-63 (Pa. Super. 2008).

> "While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child."

> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

In re Adoption of C.D.R., 111 A.3d at 1219 (citations omitted).

Here, the only evidence presented of a bond between Mother and Child was Ms. Ottaviani's testimony — that Mother enjoyed spending time with Child and "was formulating" a bond with him. N.T., 9/4/19, at 33, 36. On the other hand, both Caseworker Supervisor Parmerter and Permanency Caseworker Billings testified termination was in Child's best interest and would have no detrimental effect on him. N.T. at 15, 24. Furthermore, Caseworker Billings stated Child "is very comfortable around" his foster parents, who "do a very good job of meeting his needs," including medical care. Id. at 23.

The Orphans' Court concluded: "Termination would not adversely affect any bond between Mother and Child. [W]hile the Court is sympathetic to Mother's limitations, this Court is clearly convinced that the elements of 23 Pa.C.S.[ ] § 2511(b) have been met." Orphans' Ct. Op. at 13. The Court further reasoned:

> [Child] is happy and healthy in his foster/adoptive home. He has been there his entire short life, except for the 2 months he lived with Aunt. The foster parents are meeting all his medical needs and accepting the services available to address his conditions. Child and the foster parents have developed a healthy bond. The severing of the bond, if any, with [M]other would not detrimentally affect Child.

Id. at 12.

After careful review of the record, we do not disturb the court's finding for termination pursuant to Subsection 2511(b). The Court considered that Child has been placed in his foster home almost the entirety of his life, save for two months when he lived with Mother, Aunt, and Grandfather. The Court noted Child's bond with his foster parents, who were providing the care and medical needs he required, and the Child's safety needs favored termination. See In re T.S.M., 71 A.3d 251, 267; In re Adoption of C.D.R., 111 A.3d at 1219; In re K.Z.S., 946 A.2d at 762-63. Accordingly, we find no abuse of discretion or error in the Orphans' Court termination of Mother's parental rights under 23 Pa.C.S. § 2511(a)(2) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/9/2020